# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 14, 2008        Decided June 24, 2008

No. 07-1070

NORTH AMERICA FREIGHT CAR ASSOCIATION,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

BNSF RAILWAY COMPANY,
INTERVENOR

On Petition for Review of an Order of the
Surface Transportation Board

*John M. Cutler, Jr.* and *Andrew P. Goldstein* argued the cause for the petitioner.

*Anika Sanders Cooper*, Attorney, Surface Transportation Board, argued the cause for the respondents. *Thomas O. Barnett*, Assistant Attorney General, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, United States Department of Justice, and *Ellen D. Hanson*, General Counsel, and *Craig M. Keats*, Deputy General Counsel, Surface Transportation Board, were on brief.

*Richard E. Weicher*, *Sidney L. Strickland, Jr.*, *Robert M. Jenkins III* and *David M. Gossett* were on brief for the intervenor.

Before: HENDERSON, BROWN and KAVANAUGH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The petitioner is North America Freight Car Association (NAFCA), a trade association of companies that use private railroad freight cars (i.e., cars that are owned or leased by the companies themselves or by other private shippers rather than by the railroad) to transport goods on track owned by railroads. NAFCA seeks review of a decision of the Surface Transportation Board (STB, Board) denying NAFCA's challenge to "storage" and "demurrage"[1] charges (collectively 2001 Charges), which the Burlington Northern and Santa Fe Railway Company—now BNSF Railway Company (BNSF)—imposed in 2001 for empty private freight cars that remain on BNSF tracks beyond a base "free time" period (ranging from one to five days). *See N. Am. Freight Car Ass'n v. BNSF Ry.*, STB Docket No. 42060 (Sub-No. 1), 2007 WL 201203 (served Jan. 26, 2007) (STB Dec.). NAFCA petitions for review on the ground that BNSF's charges violate three provisions of the Interstate Commerce Commission Termination Act of 1995 (ICCTA):[2] (1) 49 U.S.C.

---

[1]"Demurrage" refers to "a charge assessed for detaining a freight car, truck, or other vehicle beyond any free time stipulated for loading or unloading." *PCI Transp., Inc. v. Fort Worth & W. R.R.*, 418 F.3d 535, 537 n.1 (5th Cir. 2005). "Demurrage" and "storage" are often used interchangeably with respect to such charges.

[2]The ICCTA, Pub. L. No. 104-88, 109 Stat. 803 (1995), abolished the Interstate Commerce Commission (ICC, Commission), created the STB, transferred to it the ICC's remaining regulatory authority and

§ 10702(2), which requires that a railroad "establish reasonable . . . practices" related to transportation and service; (2) 49 U.S.C. § 10746, which requires that demurrage charges fulfill two enumerated objectives; and (3) 49 U.S.C. § 10745, which authorizes a rail carrier to compensate a shipper for providing a service related to transportation. For the reasons set out below, we deny NAFCA's petition.

## I.

In July 2001, BNSF instituted a new "storage" charge for empty private industrial cars (primarily tank cars) and "demurrage" charge for empty private covered hopper cars, which are used to transport grain, grain products and sugar. Under BNSF's plan, the storage charge for an industrial car begins to accrue at the second 12:01 a.m. after "constructive placement" of the car—that is, after BNSF notifies the shipper the empty car is ready to deliver to the shipper—and continues until the shipper directs BNSF to deliver the car to the shipper's facility. The storage charge is a "straight" three-tiered rate: $25 per day in areas where track congestion is most likely, $15 per day where congestion is likely and $10 per day where congestion is least likely. *See* STB Dec. 2; Verified Statement of BNSF General Director Douglas W. Langston (Langston Statement) 9-11. BNSF's demurrage charge for an empty hopper car is an "average" assessment: upon constructive placement, each car is assigned two "credits" and for each day thereafter that the car remains on the track, one "debit" is assessed until the shipper orders the car delivered. At the end of each month, all of the debits and credits for cars delivered to a particular location are reconciled and the shipper is charged $50 for each net debit. STB Dec. 2-3; Langston Statement 10 n.8. BNSF instituted two policies to ease the transition to the new storage and demurrage

provided that ICC precedent applies to the STB. *Ariz. Elec. Power Coop., Inc. v. STB*, 454 F.3d 359, 364 n.* (D.C. Cir. 2006).

charge regime: (1) it agreed to waive charges for shippers that build facilities to store their cars within the first year of the program; and (2) it offered shippers "floating" leases of BNSF track to store their cars, which leases permit BNSF to move the stored cars as needed to free up track. Langston Statement 8-9, 24-25.

In August 2001, NAFCA filed a complaint with the STB challenging both the storage charge and the demurrage charge on the ground that they both violate four provisions of the ICCTA: 49 U.S.C. §§ 10702(2), 11121(a), 10746 and 10745. *See N. Am. Freight Car Ass'n v. BNSF Ry.*, STB Docket No. 42060 (Sub-No. 1), Am. Compl. 7-8 (filed Mar. 14, 2005).[3] In a decision served January 26, 2007, the STB denied NAFCA's complaint. In its decision, the Board explained why railroads had begun to extend storage and demurrage charges—historically limited to loaded cars—to unloaded rail cars as well:

> In recent years, private car owners have increased their private car fleets in an attempt to have more cars available during seasonal and other periods of greater need. At times this has increased the number of empty private cars on the system, which has led to various difficulties and inefficiencies for carriers on whose lines the private cars sit. In response, a number of

---

[3]NAFCA also filed a separate protest and petition asking the STB to investigate the tank car storage charge as a "departure tariff," that is, a charge that departs from the terms of a compromise agreement governing the mileage allowances for tank car use, as set out in *Investigation of Tank Car Allowance Sys.*, 3 I.C.C.2d 196 (1986), *modified*, 7 I.C.C.2d 645 (1991). The Board denied the petition in 2004. *See N. Am. Freight Car Ass'n—Protest & Pet. for Investigation—Tariff Publications of the Burlington N. & Santa Fe Ry.*, STB Docket No. 42060 (served Aug. 13, 2004). That denial is not before the court.

railroads have begun charging shippers for holding a shipper's empty private cars on their systems.

STB Dec. 2. The Board upheld BNSF's storage and demurrage charges, finding that they "meet both purposes for which such charges are applied to loaded cars: they compensate the railroad for use of its assets (i.e., the space on its track or at its yards), and they encourage more efficient use of freight cars on its system." *Id*. at 9. The Board further concluded that such "[p]romotion of cost recovery and efficient equipment utilization are not unreasonable purposes." *Id*.

On March 22, 2007 NAFCA filed a petition for review.

**II.**

NAFCA challenges the 2001 Charges as violative of 49 U.S.C. §§ 10702(2), 10746 and 10745.[4] Our review of the Board's decision is deferential:

> We will set aside a Board decision only if it is "arbitrary, capricious, an abuse of discretion, . . . otherwise [unlawful, or] . . . unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). In ascertaining whether a railroad's rate is reasonable, the Board is at the zenith of its powers and thus entitled to particular deference. Where the Board's findings rest on such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and where the Board has articulated a rational connection between the facts found and the decision made, we will not disturb its judgment. In dealing with complex matters within its expertise, the Board has "wide discretion in formulating appropriate solutions.

---

[4]NAFCA does not now argue, as it did before the STB, that the 2001 Charges violate 49 U.S.C. § 11121. *See* NAFCA Br. 26-61.

*PPL Mont., LLC v. STB*, 437 F.3d 1240, 1244-45 (D.C. Cir. 2006) (citations and quotations omitted) (alterations in original). Applying this standard, we address each of NAFCA's arguments.

### A. *"Unreasonable Practices" Under 49 U.S.C. § 10702*

First, NAFCA contends the STB arbitrarily concluded that the 2001 Charges are "reasonable practices" under 49 U.S.C. § 10702(2). Section 10702 provides:

> A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall establish reasonable—
>
> (1) rates, to the extent required by section 10707, divisions of joint rates, and classifications for transportation and service it may provide under this part; and
>
> (2) rules and practices on matters related to that transportation or service.

On the record before us, we conclude the STB permissibly determined that the 2001 Charges constitute reasonable practices under section 10702(2).

Preliminarily, NAFCA argues that the STB erred in finding that the 2001 Charges are consistent with four congressional rail policies set out in 49 U.S.C. § 10101.[5] In its decision the STB

---

[5] Section 10101 provides in relevant part:

> In regulating the railroad industry, it is the policy of the United States Government—
>
> (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
>
> . . .

found as follows:

> Recovering the cost of empty private car storage from the suppliers of those cars advances several aspects of the rail transportation policy, including allowing the demand for services to establish rates (49 U.S.C. 10101(1)), fostering sound economic conditions in transportation (49 U.S.C. 10101(5)), encouraging efficient management of railroads (49 U.S.C. 10101(9)), and encouraging individualized ratemaking (49 U.S.C. 10101(10)).

STB Dec. 7. NAFCA asserts the STB's finding as to each of the four listed statutory polices is arbitrary. We disagree.

NAFCA contends the 2001 Charges do not further the first cited policy—"to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail," 49 U.S.C. § 10101(1)—because "demurrage charges are not established by 'demand' but, instead, as compensation for use of a railroad car and to encourage more prompt release of equipment." NAFCA Br. 29. The STB, however, based its approval of the 2001 Charges largely on the

---

> (5) to foster sound economic conditions in transportation and to ensure effective competition and coordination between rail carriers and other modes;
>
> . . .
>
> (9) to encourage honest and efficient management of railroads;
>
> (10) to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability;
>
> . . . .

49 U.S.C. § 10101.

increase in demand for track in recent years. As the Board explained: "[R]ailroad conditions today are quite different from what they were even 10 years ago. Traffic is up and capacity is tight." STB Dec. 6.

Second, NAFCA asserts the 2001 Charges do not "foster sound economic conditions in transportation," 49 U.S.C. § 10101(5), relying on NAFCA's expert testimony that they have "just the opposite effect." NAFCA Br. 29. The STB, however, reached the contrary—and reasonable—conclusion that the 2001 Charges serve the important economic purposes of "eliminat[ing] cross-subsidies," *see infra* Pt. II.A.4, and "compensat[ing] BNSF for the use of its track." STB Dec. 6.

Third, NAFCA argues that the 2001 Charges do not "encourage . . . efficient management of railroads," 49 U.S.C. § 10101(9), because they "provide no incentive for a railroad to improve erratic, undependable service." NAFCA Br. 30. This may be so but the STB reasonably determined that the 2001 Charges do foster efficient use of track and cars in that they "encourage shippers to utilize their private cars more efficiently and . . . discourage them from holding empty private cars on BNSF's system for extended periods of time." STB Dec. 6.

Fourth, NAFCA contends the 2001 Charges do not affirmatively promote the statutory goal "to require rail carriers, to the maximum extent practicable, to rely on individual rate increases, and to limit the use of increases of general applicability." 49 U.S.C. § 10101(10). According to NAFCA, the 2001 Charges "have nothing to do with 'individual rate increases' as contemplated by Section 10101(10)," which "was designed to discourage railroads from engaging in collective ratemaking to the extent that collective ratemaking is permissible under the ICCTA." NAFCA Br. 30. NAFCA offers no authority for its narrow interpretation of section 10101(10) and the STB read the provision more broadly—that is, also to encourage increases that reflect the costs that each individual customer

causes the railroad.  *See* STB Dec. 9 ("[F]or BNSF to seek to recover from private car suppliers the costs associated with storing those suppliers' empty private cars on its system . . . is consistent with the individualized pricing principles advanced by Congress in the Staggers Act.").  We defer to the Board's interpretation as consistent with the statutory language.  *See W. Coal Traffic League v. STB*, 216 F.3d 1168, 1171 (D.C. Cir. 2000) (where Congress's intent is not unambiguously expressed, court will "defer to the Board's interpretation of the statute so long as it is 'based on a permissible construction of the statute' " (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984))).

Apart from its objections to the STB's policy findings, NAFCA identifies five respects in which it claims  the 2001 Charges constitute an unreasonable practice in violation of section 10702(2).

### 1. BNSF's "Erratic" Service

NAFCA first claims the 2001 Charges are unreasonable because they do not reflect that BNSF's "erratic" service contributed both to the need for private cars and to the delay in retrieving empty cars from BNSF's track.  We conclude that the Board properly considered and reasonably rejected NAFCA's claims and evidence of erratic service.

First, the Board found that NAFCA failed to carry its evidentiary burden to establish that BNSF was responsible for service variability and concluded that, "[i]n light of the complexity and variety of many private car movements, it would be inappropriate to hold that a railroad's tariffs are unlawful because they do not penalize the railroad for service variability unrelated to fault."  STB Dec. 12 (citing *Capitol Materials, Inc.*, STB Docket No. 42068, slip op. at 7, 2004 WL 771676, at *6 (served April 12, 2004) ("[G]iven the many variables outside a railroad's control that may affect delivery . . . a railroad cannot

reasonably be expected always to be able to meet an ideal delivery timetable.")). The Board's conclusion was not, as NAFCA first maintains, contrary to precedent.

Regarding precedent, neither this court nor the STB has adopted a presumption, as NAFCA suggests, that variations in train service are the fault of the railroad or that the railroad should necessarily bear their costs. Instead, the decisions make manifest that the question of fault is fact-specific. *See Dana Corp. v. ICC*, 703 F.2d 1297, 1305 (D.C. Cir. 1983) (holding ICC "must permit the shippers to show that, in particular instances, the idle-car time for which charges are assessed is attributable to the fault of the carriers"); *Prince Mfg. Co. v. Norfolk & W. Ry.*, 356 I.C.C. 702, 705 (1978) ("[J]ustification for relief [from demurrage fees] depends upon the particular exigencies in each case."); *Ormet Corp. v. Ill. Cen. R.R.*, 341 I.C.C. 647, 650-51 (1972) ("[J]ustification for relief depends upon varying circumstances."). Further, both this court and the Board have indicated the burden is on a complaining shipper to show that demurrage fees are excessive in a particular instance because of some fault on the railroad's part. In *Dana Corp.*, for example, we overturned the ICC's decision and remanded to the Commission specifically to permit "*the shippers to show*" the demurrage charges were "attributable to the fault of the carriers." 703 F.2d at 1305 (emphasis added). In *Cities Service Oil Co. v. Soo Line Railroad*, 356 I.C.C. 838, 842 (1977), the ICC declared that a complainant bears "the burden of establishing by competent evidence" that challenged demurrage charges are "unjust and unreasonable" and dismissed the complaint seeking waiver of the charges because the shipper failed to satisfy its burden. Here, the STB reasonably concluded that NAFCA did

not meet its burden because it offered no evidence that particular variations in service were BNSF's fault.[6] *See* STB Dec. 12-13.

With regard to the need for private cars, the Board specifically found it was caused largely by fluctuations in demand: "In recent years, private car owners have increased their private car fleets in an attempt to have more cars available during seasonal and other periods of greater need." STB Dec. 2. This finding was supported by substantial evidence in the record. *See* Verified Statement of CHS, Inc. Vice President Dan Mack (Mack Statement) ¶ 8 (shippers furnish their own general purpose covered hopper cars because railroads do not provide sufficient cars "to meet all levels of demand"); Verified Statement of Archer Daniels Midland Co. Senior Vice President Randy Neumayer (Neumayer Statement) ¶ 3 (company acquires private cars to be assured its grain processing and flour milling facilities "receive a sufficient and timely supply of raw materials" and because cars are "essential to meet ADM's commitments to its customers, who often lack storage capacity or receive non-fungible commodities that cannot be commingled"); Verified Statement of Bunge North America, Inc. Vice President Darrell R. Wallace (Wallace Statement) ¶ 7 (company-owned hopper cars are "essential" because of varying market requirements); *see also* STB Dec. 12-13.

As for the delayed retrieval of cars, the Board pointed out that NAFCA did not explain why particular shippers "are not prepared to receive their empty cars before charges accrue." STB Dec. 13. The Board noted that shippers "have the ability to track their cars, but they have not shown that they have done so"

---

[6]Placing the burden on the complaining shipper is consistent with the Commission's general rule that the complainant has the burden to show that a practice is "unreasonable" under section 10702. *See Aluminum Co. of Am. v. St. Louis-S.F. Ry. Co.*, 364 I.C.C. 137, 143 (1980).

and that "[e]ven without tracking their cars, private agricultural hopper car owners are given an average of 2 days to accept their empty private cars without charge," which, the Board noted, is adequate free time for "the vast majority of private car owners" who "do not incur demurrage or storage charges." *Id*.

Finally, even had NAFCA offered evidence of particular instances of railroad fault, it was not unreasonable for the Board to conclude that the fact "that a shipper might suffer hardship from a service failure at a particular location or particular locations does not warrant overturning the railroad's entire storage or demurrage program, as there are other remedies available for that situation." *Id*. n.46 (noting *Dana Corp*. allowed shippers "to show that, *in particular instances*, the idle-time for which charges are assessed is attributable to the fault of the carriers" (emphasis added)). Specifically, the Board pointed out that it is "available to hear [shippers'] complaints" in the "rare" instance where the railroad and the shipper cannot resolve a particular demurrage dispute. *Id*. n.47.

## 2. Proportionality of "Penalties"

Relying on *Consolidated Rail Corp. v. ICC*, 646 F.2d 642 (D.C. Cir. 1981), NAFCA next asserts the 2001 Charges' short free time periods are "more costly measures than are necessary" to correct the asserted problem of track congestion. NAFCA Br. 38. In *Consolidated Rail*, the court upheld the ICC's decision cancelling a tariff that required a shipper to pay for expensive "special train service" to transport hazardous radioactive materials—a requirement the ICC found was "unnecessary and wasteful." 646 F.2d at 643. The ICC determined that " '[a]ll available evidence support[ed] the finding that . . . use of special trains provide[d] no cognizable safety benefit' " and therefore found, " 'based on the evidence at hand, the special train requirement' "—which was " 'several times as costly as regular service without (any) commensurate safety benefits' "—was " 'wasteful transportation and an unreasonable practice in

violation of Section 10701(a) of the [Interstate Commerce Act].' " *Id*. at 645 (quoting *Trainload Rates on Radioactive Materials, E. R.R.*, 362 I.C.C. 756, 773 (served May 2, 1980)). We explained that the ICC "based this factual determination primarily on evidence it drew from its previously issued Environmental Impact Statement," which "specifically addressed the relative safety of [special train service] and regular trainload service for radioactive material." *Id*. Accordingly, we held that "the ICC acted properly in determining, on the record before it, that the use of special train service was unnecessary," *id*. at 643, observing that the railroads there "failed to present evidence sufficient to rebut" the presumption (arising from the regulatory regime there[7]) that "heavy additional expenditures by the railroads . . . were . . . unnecessary and hence unreasonable," *id*. at 656.

In this case, the STB likewise "acted properly" in concluding that NAFCA, which bore the burden of showing unreasonableness, *see Aluminum Co. of Am. v. St. Louis-S.F. Ry. Co.*, 364 I.C.C. 137, 143 (1980), failed to prove its claim. NAFCA asserts it is unreasonable to impose demurrage charges after as few as 25 hours (or even an average of two days) of free time when the problem is cars remaining on track "for 'extended periods of time' exceeding 30 days per car." NAFCA Br. 40 (quoting STB Dec. 6). This argument misconstrues the record. Before the Board, BNSF noted that 2,686 empty private cars were on its tracks for more than thirty days on April 30, 2001, simply as an "example" of the extent of the problem. *See* BNSF

---

[7]In *Consolidated Rail*, the U.S. Department of Transportation and the Nuclear Regulatory Commission had established "complete and comprehensive" safety standards "pursuant to specific statutory authority." 646 F.2d at 650. We concluded that a presumption arose that a safety expenditure not specified in the regulations was unnecessary and unreasonable. Here, there is no basis for a similar presumption.

Reply Statement of Fact & Argument 15 n.3 (citing Langston Statement 5). In its decision, the STB relied on this figure, along with others, not, as NAFCA suggests, to establish a benchmark but rather to contrast the time cars sat empty on BNSF's tracks before and after the 2001 Charges were imposed. *See* STB Dec. 10. Neither the STB nor BNSF indicated that cars remaining on the tracks for shorter periods of time were not also problematic. Nor was the STB required to adopt the five-day free time period NAFCA proposed based on NAFCA's bare allegation that "BNSF's avowed goal of curbing 'long term' storage of empty private cars on BNSF track clearly can be satisfied with five days' free time." NAFCA Rebuttal Statement 71. NAFCA offered no evidence to establish that a five-day period is necessarily more reasonable than two days (or any other specific time period).

### 3. Disparate Treatment of Private Shippers

NAFCA also asserts the 2001 Charges are unreasonable because they discriminate against private car shippers in favor of shippers using railroad-owned cars. According to NAFCA, "BNSF will hold its own cars indefinitely at no charge for shippers who order them for loading, but requires private car shippers to accept or order their empty cars within as little as 25 hours after arrival of the cars, or face steep penalties." NAFCA Br. 41. In its decision, the Board responded that where a difference in treatment exists, namely, for railroad-owned cars in the "C" pool designation—i.e., those which "are generally associated with a particular station and may in fact be used by multiple shippers," STB Br. 29-30 n.26 (citing Langston Statement 70)— the cars "may be moved by the railroad to limit congestion." STB Dec. 15.[8] We find this explanation for the

---

[8]According to the STB (and NAFCA does not dispute this), other railroad-owned cars, which are assigned exclusively to a single shipper, "are treated no more favorably than private cars." STB Dec.

varying treatment reasonable. NAFCA argues that in reality 98% of the time BNSF does not move the C pool cars, NAFCA Br. 41-42 (citing NAFCA Rebuttal Statement 61), but this fact does not vitiate the STB's rationale. It remains true that BNSF can and does move C pool cars as needed to free up track and in the future may do so more frequently as demand or congestion requires.

### 4. Cross-Subsidization

NAFCA further argues the 2001 Charges are unreasonable because they force private car shippers to subsidize shippers who use railroad cars because private shippers pay twice for the use of BNSF track: once through the freight rates they pay and a second time *via* the 2001 Charges. The STB, however, agreed with BNSF that "prior to the 2001 Charges, all other shippers were cross-subsidizing private car owners for the cost of holding empty private cars for extended periods on the BNSF system." STB Dec. 6. As the Board explained:

> Storing empty private cars imposes costs on the railroad, including the loss of system fluidity and the opportunity cost associated with using track for long-term car storage that instead could be used to facilitate the efficient movement of freight. The 2001 Charges recover costs from those that generate them.

*Id.* (footnote omitted).[9] Thus, according to the Board, the 2001

15 (citing BNSF Reply Statement 68-75).

[9]NAFCA argues the STB erred in not addressing the testimony of NAFCA's expert witness that "the 2001 Charges do not represent 'unbundling' in an economic sense" because "[t]rue unbundling is designed to provide a buyer with an option that offers a lower price for the product when it features fewer accessories and components, but BNSF is offering no lower price to shippers so that they might obtain

Charges eliminated rather than effected cross-subsidization. The Board's analysis is both logical and reasonable. In rejecting NAFCA's argument, the Board noted that NAFCA offered no evidence that the line haul rates before the 2001 Charges "included the cost of storing empty private cars for any particular length of time or that they included all such costs." STB Dec. 7.[10]

### 5. More Efficient Rail Service

Finally, NAFCA argues the 2001 Charges are unreasonable because they have not, as the STB claimed, resulted in more efficient rail service. On this subject, the STB found:

> [I]n May 2001 empty private industrial cars sat on BNSF's track for an average of 2 days after constructive placement. By contrast, in July 2005, the average was less than half a day. And in May 2001, empty private agricultural cars sat on BNSF's track for an average of one and one-third days, whereas in July 2005, the average was two-fifths of a day. Further, BNSF shows that billings for empty private cars sitting

holding track from another source." NAFCA Br. 44. But the STB did not rely on an unbundling theory and it adequately explained why it believed that the 2001 Charges promoted individualized pricing by requiring each shipper to shoulder the cost of storing its cars on BNSF track.

[10]Alternatively, the Board asserted that, "even if prior rates did fully incorporate the costs of indefinitely storing empty private cars . . . , BNSF demonstrates that the practices of the owners and users of private cars in recent years have put increasing burdens on the carrier's infrastructure and operations, and under the law, BNSF may raise the price for its services, as long as the total amount paid is reasonable." STB Dec. 7 (footnote omitted) (noting also that NAFCA "do[es] not here challenge the reasonableness of any line-haul rates").

on its track beyond the allowed free period have dropped consistently every year since 2001—from $12.5 million in a six-month period in 2001, to $11.2 million in 2002, to $6.8 million in 2003, to $4.7 million in 2004. Indeed, Complainants admit that the 2001 Charges may well have "caused many shippers to endeavor to order empty private cars from BNSF track into shipper loading tracks more quickly than before the changes took effect"—the very effect the 2001 Charges were intended to produce.

STB Dec. 10 (footnotes omitted) (quoting NAFCA Opening Statement of Fact and Argument (NAFCA Opening Statement) 30). NAFCA does not dispute the Board's "reduction" findings, which are supported by record evidence. NAFCA does, however, contest the Board's determination that the reductions show the 2001 Charges have been effective.

First, NAFCA claims that the reduction in post-placement holding time for agricultural hopper cars is only twelve hours and summarily asserts that such a short reduction "is not sufficient to assure more prompt physical removal of the car from BNSF track even where BNSF provides daily switching." NAFCA Br. 47 (citing NAFCA Rebuttal Statement 26-27 (citing Wallace Rebuttal Verified Statement ¶ 9)). NAFCA references its argument before the Board that "a reduction in the time between the commencement and termination of constructive placement" does not necessarily result in "a commensurate reduction in the time that empty private cars sat on BNSF track" because "BNSF does not necessarily remove an empty private car from BNSF track and place it for loading as soon as, or even on the same day as, BNSF receives the shipper's placement order." NAFCA Rebuttal Statement 25-26. The Board found, however, (and NAFCA concedes) that there was a decrease in the total time the car "sat" on the track after constructive placement—both before and after the shipper orders the car

delivered. STB Dec. 10; Langston Statement 13 ("The charts clearly show that since the storage policy was first adopted, the average time that private cars *are left on* BNSF's tracks has decreased by over one full day for industrial privates and by roughly half a day for agricultural privates." (citing *id*. exs. E, F)) (emphasis added); NAFCA Br. 47. As NAFCA offers no basis to believe the lag time to which it refers (between the shipper's order to deliver its car and the car's actual movement) decreased since 2001, it is logical to infer the reduction in total time reflects a decrease in the time before the shipper orders delivery.[11]

Second, NAFCA argues that the reduction in demurrage fees since 2001 is illusory because of a corresponding increase over the same period in payments to BNSF under the floating track leases. NAFCA claims that the "only change was that the empty private cars remained on the same BNSF track as prior to the 2001 Charges, with BNSF now collecting lower demurrage charges but higher track rentals." NAFCA Br. 47-48. Even if there has been no net reduction in the number of empty cars on BNSF's tracks, nonetheless there has been an increase in efficiency because, as the Board noted, the leased space is "in less congested areas" and the leases "permit BNSF to move and store cars where they will cause the least disruption." STB Dec. 11 & n.32; *see* Langston Statement 25.

### B. Section 10746: Demurrage Charge Statute

NAFCA also contends that the 2001 Charges violate 49 U.S.C. § 10746. Section 10746 provides:

---

[11]That there was little or no improvement in BNSF's on-time performance or average train velocity, as NAFCA asserts, does not negate the other evidence showing the 2001 Charges have been effective.

> A rail carrier providing transportation subject to the jurisdiction of the Board under this part shall compute demurrage charges, and establish rules related to those charges, in a way that fulfills the national needs related to—
>
>> (1) freight car use and distribution; and
>>
>> (2) maintenance of an adequate supply of freight cars to be available for transportation of property.

NAFCA asserts the 2001 Charges violate this statute in two respects.

### 1. Lack of "Error Relief"

NAFCA first asserts the 2001 Charges do not fulfill the statute's two objectives because they do not provide shippers with adequate relief for "bunching," i.e., "deliveries not reasonably timed or spaced," STB Dec. 13, or other delays caused by BNSF's erratic service. NAFCA complains that BNSF's "straight" tank car storage plan (which assesses a flat daily storage charge) provides for only limited relief from storage charges accrued as a consequence of erratic service such as bunching[12] and that BNSF's average hopper demurrage plan provides for no "error relief" at all in such circumstances. NAFCA Br. 50. At a minimum, NAFCA asserts, in light of the discrepancies between the straight plan and the average plan, hopper car users should be permitted to choose between the two. The STB rejected this argument, explaining that "BNSF's straight private car storage program does allow for relief from bunching that occurs as a result of an act or neglect of BNSF,"

---

[12]BNSF's straight plan permits a shipper to submit a claim for relief from erroneously assessed charges ("error relief"), including those caused by bunching. *See* Mack Statement App. B-2, at 4-5.

STB Dec. 13 & n.45, and that "it is not unusual for average demurrage plans to exclude or limit relief for bunching, in light of the benefit of the averaging afforded under such plans," *id*. at 13 (footnote omitted) (citing *Capitol Materials, Inc.*, STB Docket No. 42068, slip op. at 7, 2004 WL 771676, at *6 (served April 12, 2004)). We find no error in the Board's decision to uphold the storage and demurrage plans at issue notwithstanding the limited availability of relief thereunder.

First, given the longstanding practice of not providing error relief under an average demurrage plan, BNSF's failure to offer such relief under its average plan is neither surprising nor arbitrary. *See Ill. Cent. Gulf R.R. v. ICC*, 702 F.2d 111, 114 (7th Cir. 1983) (" '[R]ecent cases . . . have been uniform in their adherence to the policy that penalty demurrage should not be excused where an average agreement is in effect.' " (alteration in original) (quoting *Cleveland Elec. Illuminating Co. v. ICC*, 685 F.2d 170, 174 (6th Cir. 1982); citing *Empire-Detroit Steel Div. v. ICC*, 659 F.2d 396, 398 (3d Cir. 1981); *Monongahela Power Co. v. ICC*, 640 F.2d 504 (4th Cir. 1981)); *Capitol Materials, Inc.*, 2004 WL 771676, at *2 ("Unlike 'straight' demurrage—under which no credits are available for early release of cars but relief can be available for problems such as 'bunching' . . . —under an average demurrage agreement the shipper is excused from demurrage charges only if a car is delayed by an extraordinary event like a flood, earthquake, tornado or hurricane.").

More fundamentally, contrary to NAFCA's assertion, there is no legal requirement that a demurrage charge provide "error relief" or that a shipper be afforded the option to choose between a straight and an average plan. In *Field Container Corp. v. ICC*, 712 F.2d 250 (7th Cir. 1983), on which NAFCA relies for the latter proposition, the Seventh Circuit did not impose such a requirement but simply upheld an average demurrage charge the shipper had voluntarily agreed to in lieu of the default straight

demurrage charge, noting that under the terms of the tariff, "[a] railroad [could ]not force a shipper into the average agreement" and "no shipper [was] coerced to adopt the average agreement; it [was] his choice." *Id*. at 255-56.

What the law does require, as we have already observed, is that a shipper be allowed to demonstrate before the Commission that erratic service is the fault of the railroad and that the shipper should therefore not be assessed a charge for idle track time caused thereby. *See Dana Corp.,* 703 F.2d at 1305. In this case, the Board reasonably found NAFCA did not carry its burden. The bunching evidence consists of testimony by shippers' officers that there is wide variation in transit times for their cars. *See* Neumayer Statement ¶ 6; Verified Statement of Ag Processing Inc. Senior Vice President Terry J. Voss ¶¶ 5-8; Wallace Statement ¶ 9. As we have already concluded, the Board reasonably found NAFCA failed to carry its burden to show that such service variance—much less bunching in particular—was attributable to BNSF. As the Board noted, NAFCA did "not make any specific claims of bunching" and the Board reasonably found that NAFCA's "general claim of possible harm" was "too vague to permit [the Board] to find an otherwise valid tariff unlawful." STB Dec. 13.

## 2. Statutory Findings

NAFCA asserts the Board also violated section 10746 by failing to make an affirmative finding that the 2001 Charges promote the second objective set out in the statute —namely, that BNSF's demurrage charges be computed "in a way that fulfills the national needs related to . . . (2) maintenance of an adequate supply of freight cars to be available for transportation of property." 49 U.S.C. § 10746(2). In fact, NAFCA claims to have "establish[ed] a prima facie failure of the 2001 Charges to promote an adequate supply of freight cars in derogation of the Section 10746 goals" because NAFCA's "undisputed evidence shows that private freight cars are necessary in order to meet the

commercial needs of BNSF shippers who do not receive an adequate supply of cars from BNSF, and that one of the goals of the 2001 Charges was to reduce the number of private cars operated by shippers." NAFCA Br. 55-56. As evidence of BNSF's purportedly improper "goal," NAFCA appears to rely on a single sentence in an internal BNSF policy document addressing the 2001 Charges: "The need for a comprehensive private equipment policy has arisen from operational constraints that warrant BNSF to introduce a tool which will provide us a lever into the sizing of on-line privately supplied equipment fleets." NAFCA Opening Statement Ex. 9; *see* NAFCA Opening Statement 28. The quoted sentence, however, indicates only that BNSF desired to reduce the number of private cars on its track (which BNSF freely admits) and not, as NAFCA suggests, that BNSF sought to reduce the number to an inadequate level.[13] Further, the Board made an affirmative finding there was no "evidence that the 2001 Charges have made, or are likely to make, the freight car supply inadequate." STB Dec. 11. In the absence of any evidence to the contrary (and NAFCA cites none), the Board's finding satisfies its section 10746(2) obligation, if any, to make an express finding.

### C. Section 10745

Finally, NAFCA argues that BNSF's failure to compensate shippers for storing their cars violates 49 U.S.C. § 10745, which, NAFCA asserts, requires such compensation. We conclude the STB reasonably determined there is no section 10745 obligation.

---

[13]In fact, on the same page, the policy document identifies one of the demurrage policy's benefits as "[p]rovid[ing] leverage for BNSF to have private owners/lessors *properly* size their fleets." NAFCA Opening Statement Ex. 9 (emphasis added).

Section 10745 provides:

> A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part may establish a charge or allowance for transportation or service for property when the owner of the property, directly or indirectly, furnishes a service related to or an instrumentality used in the transportation or service. The Board may prescribe the maximum reasonable charge or allowance a rail carrier subject to its jurisdiction may pay for a service or instrumentality furnished under this section. The Board may begin a proceeding under this section on its own initiative or on application.

To the extent the statute may require that a railroad compensate shippers under some circumstances, the STB reasonably determined that the statute does not apply to shippers that provide their own storage for cars.[14]

---

[14]Thus, we need not and do not decide whether section 10745 imposes an affirmative obligation on a railroad to establish a charge or allowance for transportation service furnished by a shipper. NAFCA contends that, "[a]lthough [the language of section 10475] appears on the surface to be precatory, the case law establishes that it is actually mandatory," quoting *Bud Antle, Inc. v. United States*, 593 F.2d 865, 872 (9th Cir. 1979) ("If a 'shipper legitimately performs a service, it is entitled, under the plain terms of [then-49 U.S.C. App. § 15(15)], to be paid by the carrier a just and reasonable allowance.' "). NAFCA Br. 56 (quotation omitted). The statute at issue in *Bud Antle*, since repealed, presumed the existence of a charge or allowance and mandated that it be published and be reasonable:

> "If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor *shall* be published in tariffs or schedules filed . . . and *shall* be no

In its decision, the Board explained its interpretation of section 10745 as follows:

> A shipper constructing its own storage space for storage of its own idle cars is not furnishing a rail carrier an instrumentality used in the transportation of freight, nor is it providing a service related to such transportation. *See* 49 U.S.C. 10102(9)(B) (identifying, as within the meaning of "transportation," services including storage of goods being shipped, but not storage of rail cars). Rather, it is assuming, as it should, a cost associated with the fleet-sizing decisions that the shipper itself has made.

STB Dec. 15. We believe the Board's distinction—between an instrumentality or service directly related to the actual movement of freight when in transit, such as storing goods before delivery, and one that is not so directly related, such as "storing" a private car once it is emptied of its freight—reflects a permissible interpretation of the statutory phrase "a service related to or an instrumentality used in the transportation or service related to movement" and is therefore entitled to deference. *See Ass'n of Am. R.Rs. v. STB*, 237 F.3d 676, 680 (D.C. Cir. 2001).

---

> more than is just and reasonable, and the Commission may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order . . . ."

593 F.2d at 869 (quoting 49 U.S.C. § 15(13), *repealed* by Pub. L. No. 95-473, § 4(b), 92 Stat. 1466 (1980)) (emphases added). Current section 10745, by contrast, simply provides that a "rail carrier . . . *may* establish a charge or allowance." (Emphasis added.) Given the differences between the two statutes, we decline to hold that section 10745 *requires* that a charge or allowance be imposed.

NAFCA now argues the STB erred in relying on subsection (9)(B) of the statute while ignoring subsection (9)(A), which defines "transportation" to include "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9)(A). NAFCA contends the area in which a private shipper stores its rail cars necessarily comes within the definition because it is a "yard, property, facility [or] instrumentality . . . related to the movement of . . . property . . . by rail." We believe, however, that the distinction the Board drew in construing subsection (B) applies equally to subsection (A), which uses similar language in its requirement that, to qualify as "transportation," the storage facility must be "related to the movement of passengers or property, or both, by rail," and which may, as with subsection (9)(B), reasonably be interpreted to exclude storage of rail cars no longer moving goods.

For the foregoing reasons, the petition for review is denied.

*So ordered.*