# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 10, 2011        Decided March 29, 2011

No. 10-1138

BROTHERHOOD OF RAILROAD SIGNALMEN ET AL.,
PETITIONERS

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

MASSACHUSETTS DEPARTMENT OF TRANSPORTATION AND
CSX TRANSPORTATION, INC.,
INTERVENORS

———

On Petition for Review of an Order
of the Surface Transportation Board

———

*Richard S. Edelman* argued the cause for the petitioners. *Michael S. Wolly* was on brief.

*Jeffrey D. Komarow*, Attorney, Surface Transportation Board, argued the cause for the respondents. *Robert B. Nicholson* and *John P. Fonte*, Attorneys, United States Department of Justice, and *Raymond A. Atkins*, General Counsel and *Craig M. Keats*, Deputy General Counsel, Surface Transportation Board, were on brief.

*Keith G. O'Brien, Peter J. Shudtz* and *Louis E. Gitomer* were on brief for the intervenors.

Before: HENDERSON, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: The petitioners—the Brotherhood of Railroad Signalmen, the Brotherhood of Maintenance of Way Employees Division/IBT and the American Train Dispatchers Association (collectively, Unions)—challenge a decision of the Surface Transportation Board (STB, Board) holding that the purchase by the Massachusetts Department of Transportation (MassDOT) of railroad track and other rail assets from CSX Transportation (CSXT), which reserved a permanent, exclusive freight easement over the track, is not the acquisition of a "railroad line" requiring STB authorization or exemption under the Interstate Commerce Commission Termination Act of 1995 (ICCTA),[1] 49 U.S.C. § 10901(a)(4). *Mass. Dep't of Transp.—Acquisition Exemption—Certain Assets of CSX Transp., Inc.*, Fin. Docket No. 35312 (STB May 3, 2010) (MassDOT Dec.). Because the STB's decision reflects a reasonable interpretation of the statute—and in particular of the term "railroad line" as used therein—we uphold the Board's decision.[2]

---

[1]The ICCTA, Pub. L. No. 104-88, 109 Stat. 803 (1995), abolished the Interstate Commerce Commission (ICC, Commission), created the STB, transferred to it the ICC's remaining regulatory authority and provided that ICC precedent applies to the STB. *N. Am. Freight Car Ass'n v. Surface Transp. Bd.*, 529 F.3d 1166, 1169 n.2 (D.C. Cir. 2008).

[2]We are satisfied that the Unions have standing under Article III of the United States Constitution notwithstanding their own failure to

clearly articulate the requisite injury. *Commuter Rail Div. of Reg'l Transp. Auth. v. Surface Transp. Bd.*, 608 F.3d 24, 30 (D.C. Cir. 2010) ("The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation omitted). The Unions claim in their opening brief that they and their members are or will be injured because their collective bargaining agreements with CSXT "were rendered . . . ineffective as a result of the acquisition," the Union's members no longer have seniority rights under the agreements and, if MassDOT is not a "carrier" subject to the Railway Labor Act (RLA), it "will not be obligated to collectively bargain with the Unions" and it "can contract to have rail work performed by non-carrier entities whose employees could not be organized under the RLA." Pet'rs' Br. 13-14. The Unions acknowledge, however, that MassDOT's current system operator is the Massachusetts Bay Commuter Railroad, which is a "carrier" subject to the RLA and has collective bargaining agreements with the Unions thereunder. Pet'rs' Br. 5 n.2; Intervenor's Br. 17-18 & n.11. Nor have the Unions alleged their bargaining agreements with the Massachusetts Bay Commuter Railroad are in any way inferior to the now "ineffective" bargaining agreements they had with CSXT covering the same employees. That MassDOT *might* change to a non-carrier, non-union operator some time in the future is simply speculative. *See Lujan*, 504 U.S. at 583 (1992) ("[W]e have denied standing to plaintiffs whose likelihood of suffering any concrete adverse effect from the challenged action was speculative."). Nonetheless, the STB acknowledged at oral argument that some of the Unions' members have already been displaced as a result of the acquisition and this constitutes a concrete injury sufficient to confer representational standing on the Unions. Oral Argument Recording at 15:50, *Bhd. of Signalmen v. Surface Transp. Bd.,* No. 10-1138 (D.C. Cir. Feb. 10, 2011); *see Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dept. of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009) (union has representational standing to litigate on behalf of members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested

4

**I.**

In 2009, MassDOT agreed to purchase from CSXT property interests in 70-plus miles of track and real estate (Railroad Assets), including rights-of-way and related assets, in order to expand the commuter rail system MassDOT operates through its Massachusetts Bay Transportation Authority (MBTA). Under the purchase agreement, CSXT retains a permanent and exclusive freight easement over the track and MassDOT assumes all of the dispatch and maintenance responsibilities.[3] On November 24, 2009, MassDOT filed a notice seeking an exemption under 49 U.S.C. § 10502[4] from the statutory

---

requires the participation of individual members in the lawsuit") (internal quotation omitted).

[3]The purchase of the Railroad Assets is to take place in two stages. The first occurred on June 11, 2010 and the second is expected to occur in 2012.

[4]Section 10502(a) provides:

In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Board under this part, the Board, to the maximum extent consistent with this part, shall exempt a person, class of persons, or a transaction or service whenever the Board finds that the application in whole or in part of a provision of this part—

(1) is not necessary to carry out the transportation policy of section 10101 of this title; and

(2) either–

(A) the transaction or service is of limited scope; or

(B) the application in whole or in part of the

requirement that a "person other than a rail carrier" obtain a certificate of authorization in order to "acquire a railroad line." 49 U.S.C.§ 10901(a)(4).[5] At the same time, MassDOT also filed a motion to dismiss the notice on the ground that neither authorization nor exemption therefrom was required because the Railroad Assets do not constitute a "railroad line" within the meaning of section 10901(a)(4).

In a May 3, 2010 decision, the STB granted MassDOT's motion to dismiss based on a line of precedent extending back almost 20 years to its decision in *Maine Department of Transportation—Acquisition & Operation Exemption—Maine Central Railroad Co.,* 8 I.C.C. 2d 835 (ICC 1991) (*State of Maine*). In *State of Maine*, the STB's predecessor—the

---

provision is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10502(a).

[5]Subsection 10901(a)(4) provides in its entirety:

A person may—

. . .

(4) in the case of a person other than a rail carrier, acquire a railroad line or acquire or operate an extended or additional railroad line,

only if the Board issues a certificate authorizing such activity under [section 10901(c)].

49 U.S.C. § 10901(a)(4). Under Section 10901(b), the acquiring entity must file an application and the Board must provide public notice of the certification proceeding. *Id.* § 10901(b). "The Board shall issue a certificate authorizing activities for which such authority is requested . . . unless the Board finds that such activities are inconsistent with the public convenience and necessity." *Id.* § 10901(c).

ICC—concluded it lacked jurisdiction under section 10901 over the State of Maine's acquisition of 15.66 miles of railroad track from the Maine Central Railroad Company (Maine Central) because the State of Maine purchased only physical assets, while Maine Central retained a permanent easement to conduct its common carrier freight operations. The ICC explained it did not consider the transaction to constitute the acquisition of "a railroad line" triggering mandatory review under section 10901(a)(4) because "no common carrier rights or obligations [we]re being transferred" as "both parties agree[d] that [Maine Central] retain[ed] the common carrier obligation and that it could not cease to offer service on the line without ICC permission." 8 I.C.C. 2d at 837.

Granting MassDOT's motion to dismiss, the Board concluded the Unions did not meet their burden of showing that a departure from *State of Maine*—which the ICC and STB have followed in more than 60 cases—was "warranted . . . as a matter of law or policy." MassDOT Dec. 6-7 (citing *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 667 (D.C. Cir. 2009)). The Board underscored the policy reasons behind the *State of Maine* decision, noting that the "main reason is 'to remove obstacles which might inhibit States from acquiring lines so that service can be continued,' " while "ensur[ing] long term freight service to shippers"—with the "added benefit" of "facilitat[ing] intrastate commuter operations." MassDOT Dec. at 7 (quoting *State of Maine*, 8 I.C.C. 2d at 837 n.7) (internal quotation omitted). The same policies, the Board explained, are served here because MassDOT's acquisition of the Railroad Assets will assure that adequate freight service as well as intercity passenger service continues and will allow MassDOT to expand commuter rail passenger service as well. *Id.* By contrast, abruptly abandoning *State of Maine*'s policy "could have widespread impacts on transportation planning throughout the country." *Id.* at 8. The Unions timely petitioned for review.

## II.

Notwithstanding the long line of agency precedent applying *State of Maine*, the Unions argue it was wrongly decided because its holding is inconsistent with the statutory language and with other precedent. We address each of their arguments in turn.

### A. The Statutory Language

First, the Unions assert that the language of section 10901 unambiguously mandates that MassDOT obtain STB authorization or exemption therefrom before it may acquire the Railroad Assets. "We review the [Board's] interpretation of section 10901, a statute it is charged with enforcing, under the principles set forth in *Chevron USA[] Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Detroit/Wayne County Port Auth. v. ICC*, 59 F.3d 1314, 1315 (D.C. Cir. 1995). At *Chevron* step 1, if the "Congress has directly spoken to the precise question at issue," we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. "If, however, the court determines Congress has not directly addressed the precise question at issue" but is "silent or ambiguous with respect to the specific issue, the question for the court"—at *Chevron* step 2—"is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. At issue here is the proper interpretation of the term "railroad line" and whether it may encompass more than "simply a portion of a railroad" consisting of "physical assets." Pet'rs' Br. 21.

The ICCTA does not define "railroad line" but it does define "railroad" as

includ[ing]—

> (A) a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad;

> (B) the road used by a rail carrier and owned by it or operated under an agreement; and

> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation; . . . .

49 U.S.C. § 10102(6). Relying on this definition, the Unions assert that a "railroad line is simply a portion of a railroad," reasoning:

> [I]f "railroad" is defined as including track, switches, spurs, and roadbed, a "railroad line" is necessarily comprised of track, switches, spurs, and roadbed. Accordingly, the Section 10901 requirement for Board approval of a non-carrier's acquisition of a railroad line means the physical assets of the line; the road, track, roadbed, bridges, switches, and spurs, used for railroad transportation.

Pet'rs' Br. 21. Thus, the Unions maintain, section 10901(a)(4) requires that the Board must either authorize or exempt MassDOT's acquisition of the physical assets which constitute a portion of CSXT's railroad. But the Union's focus on the statutory definition of "railroad" ignores that the operative term here is "railroad *line*." *See Nicholson v. ICC*, 711 F.2d 364, 369 (D.C. Cir. 1983) ("There is a distinction in the statute between 'railroad' and 'railroad line.' Petitioner's reasoning simply ignores the significance of the term 'line' in the phrase 'railroad line' . . . .") (citation omitted). Nor is "railroad line" necessarily

limited to a "portion" of a railroad's assets; it may refer to a railroad's entire railroad operation. *See* VIII Oxford English Dictionary 978 (2d ed. 1989) ("line": "In railway lang[uage] . . . applied . . . sometimes to an entire system of railways under one management"); Princeton Univ., "railroad line," WordNet 3.0, http://wordnetweb.princeton.edu (last visited Mar. 24, 2011) ("railroad line" is "line that is the commercial organization responsible for operating a system of transportation for trains that pull passengers or freight"). Because "railroad line" is an ambiguous term and the ICCTA is silent on its meaning, it is left to the STB to reasonably interpret the term at *Chevron* step 2. *Cf. Detroit/Wayne County Port Auth.*, 59 F.3d at 1316 (D.C. Cir. 1995) ("Because the Transportation Act nowhere defines the terms 'extension' or 'addition,' we proceed to step two of *Chevron* to determine whether the Commission's interpretation of section 10901(a) is permissible.").

Since *State of Maine*, the STB has defined "railroad line" to include not only physical railroad property but also the interstate freight transportation authority attached to the physical property. As the Board observed, "ordinarily, the Board exercises its regulatory authority under section 10901(a)(4) where a noncarrier becomes a carrier by acquiring a railroad line" and "typically the noncarrier is acquiring the rail line in order to become a carrier and provide the transportation in place of the selling carrier, which typically relinquishes some or all of its right to use the line." MassDOT Dec. 7. But "in the *State of Maine* situation, the parties' intent and the purpose of the sale is the opposite of the typical section 10901(a)(4) sale": "The seller does not relinquish its rights and obligations with respect to providing rail freight transportation" and "the noncarrier that purchases the physical assets of a rail line does not thereby assume any common carrier obligation." *Id.* Here, as in *State of Maine*, the right to provide the common carrier service remains with CSXT, the selling carrier, because it reserved for itself a permanent and exclusive freight carrier easement.

Accordingly, the Board determined the noncarrier did not become "a rail carrier providing transportation" and the acquisition is not subject to section 10901(a)(4)'s authorization requirement. *Id.*; *see also State of Maine*, 8 I.C.C. 2d at 836-37 ("Under § 10901, we have exclusive jurisdiction over the acquisition of a railroad line by a non-carrier (including a State) where the common carrier rights and obligations are also to be transferred, in whole or in part. Here, however, no common carrier rights or obligations are being transferred.") (citation omitted). As we have previously observed, the STB's treatment of the transaction is a sensible one. *See United Transp. Union-Illinois Legislative Bd. v. ICC,* 52 F.3d 1074, 1078 (D.C. Cir. 1995) ("[W]e can appreciate the logic of *State of Maine* with respect to section 10901 acquisitions by noncarriers: if the noncarrier does not thereby also acquire common carrier obligations, it is not, nor will it become, a 'rail carrier providing transportation subject to the jurisdiction' of the Commission, and hence section 10901(a) does not give the Commission jurisdiction over the transaction." (quoting 49 U.S.C. § 10901(a) (1995))).[6] By contrast, as the Board points out, the Unions' approach ignores the intended use of the Railroad Assets, which is key to determining whether a person is a "rail carrier" subject

---

[6]This interpretation is not, as the Unions contend, "inconsistent with [the Board's] treatment of the related . . . transaction" in *Massachusetts Coastal Railroad LLC—Acquisition—CSX Transportation Inc.*, Fin. Docket No. 35314, 2010 WL 4974575 (STB Mar. 29, 2010). Pet'rs' Br. 23-24 n.9. There the Board addressed the meaning of "property" in 49 U.S.C. § 11323, which separately subjects to Board jurisdiction and requires Board approval or authorization of the "purchase, lease, or contract" by one carrier "to operate property of another rail carrier." 49 U.S.C. § 11323(a)(2). In any event, it was because Massachusetts Coastal (unlike MassDOT) acquired a "permanent rail freight easement" that the STB exercised jurisdiction over the transaction. *See Mass. Coastal,* 2010 WL 4974575, at *4.

to the Board's jurisdiction. *See* 49 U.S.C. § 10102(5) (" 'rail carrier' means a person providing common carrier railroad transportation for compensation"); *cf. Nicholson*, 711 F.2d at 367 ("[W]hether a particular track segment is a 'railroad line,' requiring Commission authorization pursuant to section 10901(a), or a 'spur, industrial, team, switching, or side' track, exempt from Commission jurisdiction pursuant to section 10907(b), turns on the intended use of the track segment . . . .") (footnote omitted).

In sum, because the Board's interpretation of "railroad line" as including the right to operate as a common carrier is consistent with common usage and leads to a logical application of section 10901's authorization requirement, limited to actual carriers only, we conclude it passes muster at *Chevron* step 2.

### B. Other Decisions

The Unions contend the decisions in *State of Maine* and here are inconsistent with other agency and judicial decisions. We disagree because we find each of the cited decisions distinguishable.

First, the Unions cite earlier ICC decisions involving the acquisitions of railroad lines by governmental entities for intrastate rail transportation. They assert, for example, that *State of Maine* is inconsistent with the ICC's decision in *Common Carrier Status of States, State Agencies & Instrumentalities, & Political Subdivisions*, 363 I.C.C. 132, *aff'd*, *Simmons v. ICC*, 697 F.2d 326 (D.C. Cir. 1982), in which the ICC determined that a state's acquisition of a fully abandoned line or a line "approved for abandonment and not yet fully abandoned" was subject to section 10901's authorization requirement but should be exempted from it under 49 U.S.C. § 10505 (now § 10502, *supra* note 4). 363 I.C.C. at 141. Unlike Maine or MassDOT, however, a state acquiring an abandoned (or soon to be abandoned) line acquires not only the physical assets but also

the rights (and concomitant obligations) of freight carriage formerly possessed by the abandoning carrier, which retains no rights in the abandoned line. By contrast, in dismissing MassDOT's notice of exemption, the Board determined that because CSXT (like Maine Central) reserved the freight rights to the acquired property permanently and exclusively, MassDOT (like the State of Maine) did not acquire the rail line so that its acquisition of the Railroad Assets by themselves was not subject to section 10901's authorization requirement in the first instance and therefore did not need to be exempted from it.

Similarly, in *City of Austin, Texas—Acquisition—Southern Pacific Transportation Co.*, Fin. Docket No. 30861(A), 1986 WL 1166762 (ICC Nov. 4, 1986), the ICC required the City of Austin to obtain its authorization because, as the Commission explained in *State of Maine*, Austin in fact "assumed a common carrier obligation (even though it did not intend to operate the line itself), because by acquiring *full ownership* of the line it necessarily assumed responsibility for contracting with, and ensuring continued service by, a rail operator." 8 I.C.C. 2d at 838 n.6 (emphasis added). Unlike CSXT, the seller there retained no easement.

The Unions rely particularly on *Staten Island Rapid Transit Operating Authority v. ICC*, 718 F.2d 533 (2d Cir. 1983), *aff'g Bhd. of Locomotive Eng'rs v. Staten Island Rapid Transit Operating Auth.*, 360 I.C.C. 464 (1979), in which the Second Circuit upheld the ICC's determination that the municipality's transit authority became a common carrier when it purchased a rail line to operate local passenger service because it also had "concurrent responsibilities for maintenance of the line for interstate freight service" so as to "bring[] it within the [Interstate Commerce Act]." 718 F.2d at 539. It is true that the seller there, like CSXT, retained the right to operate freight service. Unlike CSXT, however, it did so not through a permanent and exclusive easement but through a trackage rights

agreement separate from (albeit incorporated into) the purchase and sale agreement. The ICC determined that the seller's contractual reservation of freight service "reliev[ed]" the municipality from the obligation to provide such service "but only so long as the authorized trackage rights arrangement remain[ed] in effect." 360 I.C.C. at 472. Because the municipality had received from the ICC "an unqualified certificate of public convenience and necessity" to acquire the line, it had an "implicit duty under the certificate of furnishing adequate freight service in interstate commerce (which duty l[ay] latent so long as substitute freight service [wa]s being fulfilled by [the seller] under a trackage rights arrangement)." *Id*. at 472-74; *see also Staten Island*, 718 F.2d at 539-40. In contrast, MassDOT received no "unqualified" right to the Railroad Assets—its right is qualified by CSXT's permanent and exclusive freight service easement—and therefore acquired no obligation (latent or otherwise) to provide freight service.

Finally, the Unions assert that since *State of Maine* was decided, the enactment of the ICCTA has broadened the Board's jurisdiction through unidentified "provisions" and cases have so "held," extending the Board's jurisdiction beyond interstate to include intrastate railroad transportation. Pet'rs' Br. 37-38. None of the cited cases, however, addresses section 10901 or when authorization or exemption is required. Instead, each considers the different issue of when state law regulation of rail carrier transportation is preempted under 49 U.S.C. § 10501(b). *See Franks Inv. Co. v. Union Pac. R.R.*, 534 F.3d 443 (5th Cir. 2008), *rev'd*, 593 F.3d 404 (5th Cir. 2010) (en banc); *Norfolk S. Ry. v. City of Austell, Ga.*, 1997 WL 1113647, at *6 (N.D. Ga. Aug. 18, 1997); *CSX Transp. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1583 (N.D. Ga 1996); *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288 (D. MT 1997).

### *C. Reliance on* State of Maine

The Unions also attempt to undermine the STB's reliance on *State of Maine*. To begin, they distinguish *State of Maine* on the ground that, unlike MassDOT, Maine did not take over dispatching and maintenance responsibilities for the freight service. This is true but the STB adequately accounted for this distinction. The Board noted its policy that, even where freight rights are retained by the seller, the Board will find there has been a jurisdictional acquisition if the rights acquired by the purchaser are "so extensive that the noncarrier has acquired control of the rail line," a determination it makes on a case by case basis. MassDOT Dec. at 8. "Early on, the ICC applied a relatively strict standard" but over time "determined that reasonable restrictions on freight operations are acceptable if necessary to permit commuter operations and the freight carrier has sufficient access to conduct its existing and reasonably foreseeable freight operations so that it can satisfy its common carrier obligation." *Id*. at 9. With regard to maintenance and dispatching in particular, the Board explained that "the public agency may assume responsibility for maintaining the line and dispatching freight operations if the operating procedures are reasonable and do not discriminate against freight service, and if the freight carrier has the right to inspect and to request prompt repair of any track defects." *Id*. at 9-10 (citing *Metro Reg'l Transit Auth.—Acquisition Exemption—CSX Transp., Inc.*, Fin. Docket No. 33838, slip op. at 2-3 (STB served Oct. 10, 2003); *Utah Transit Auth.—Acquisition Exemption—Union Pac. R.R.*, Fin. Docket No. 35008, slip op. at 4 (STB served July 23, 2007); *Sacramento-Placerville Transp. Corridor Joint Powers Auth.—Acquisition Exemption—Certain Assets of S. Pac. Transp. Co.*, Fin. Docket No. 33046, slip op. at 2 (STB served Oct. 28, 1996); *Los Angeles County Transp. Comm'n—Pet. for Exemption—Acquisition from Union Pac. R.R. Co.*, Fin. Docket Nos. 32374 et al., slip op. at 2 (STB served July 23, 1996)). We find the Board's policy a reasonable one as it provides that the

responsible jurisdictional carrier—here CSXT—has the opportunity to ensure the tracks are being adequately maintained and available for interstate freight transportation.

The Unions further fault the STB's emphasis on its longstanding and extensive application of *State of Maine*, noting that in the decision's progeny, there were "no oppositions to the motions to dismiss, no participation by any other party, no additional analysis by the ICC/STB, and the ICC/STB merely repeated the *State of Maine* holding in discussions of the issue limited to ½ page to 1 page." Pet'rs' Br. 40. Thus, the Unions maintain: "What the Board has characterized as a well-established, well-vetted line of precedent is merely the continuous echo of a ruling that was without foundation." *Id*. at 42. The combination of some 60 decisions and no challenge thereto in 20 years, however, suggests that potential opponents deemed such a challenge fruitless, perhaps in recognition that the Board's interpretation of section 10901(a)(4) is reasonable. In any event, that the Board has repeatedly interpreted the statute the same way for 20 years does indeed warrant deference. *See Barnhart v. Walton*, 535 U.S. 212, 220 (2002) ("[T]his Court will normally accord particular deference to an agency interpretation of longstanding duration.") (citation omitted).[7]

---

[7]The Unions also argue that the STB either has jurisdiction over the transaction or it does not and that the Board tried to have it both ways by disclaiming jurisdiction to authorize the purchase *vel non*, while at the same time purporting to "continue to have jurisdiction over the rail property." MassDOT Dec. at 3 n.4. We see nothing inconsistent or illogical in the Board's policy, which distinguishes between the transfer of physical assets and the transfer of the right to use the assets as an interstate freight carrier. It is the latter that subjects a carrier to the Board's jurisdiction.

For the foregoing reasons, the petition for review is denied.

*So ordered.*